# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
INFORMATION ASSOCIATED WITH TWO ACCOUNTS ) Case No. 21-SC-1548
STORED AT PREMISES CONTROLLED BY FACEBOOK, )
INC. PURSUANT TO 18 U.S.C. § 2703 FOR )
INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1752(a)(1) )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

Located in the＿＿＿＿＿Northern District of California＿＿＿＿＿, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1752(a)(1) and(2) - Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority; 40 U.S.C. § 5104(e)(2)(D) and (G) - Violent Entry and Disorderly Conduct on Capitol Grounds. | |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

☐ Continued on the attached sheet.

☐ Delayed notice of ＿＿＿ days *(give exact ending date if more than 30 days:* ＿＿＿＿＿ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Daniel J. Senters, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephone＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿ *(specify reliable electronic means)*.

Date: ＿＿＿5/14/2021＿＿＿

*Judge's signature*

City and state: ＿＿＿Washington, D.C.＿＿＿

Robin M. Meriweather
United States Magistrate Judge

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No.  21-SC-1548 |
| INFORMATION ASSOCIATED WITH TWO ACCOUNTS | ) |
| STORED AT PREMISES CONTROLLED BY FACEBOOK, | ) |
| INC. PURSUANT TO 18 U.S.C. § 2703 FOR | ) |
| INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1752(a)(1) | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Northern District of California _____ .
*(identify the person or describe the property to be searched and give its location)*:

See Attachment  A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment  B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____ May 14, 2021 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Robin M. Meriweather _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____ 5/14/2021 _____            _____
                                                                                                        *Judge's signature*

City and state: _____ Washington, D.C. _____            _____ Robin M. Meriweather
                                                                                                        United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| | | |
|---|---|---|
| **Return** | | |
| Case No.:<br><br> 21-SC-1548 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| |
|---|
| **Certification** |

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date:  _____


_____
*Executing officer's signature*


_____
*Printed name and title*

## <u>ATTACHMENT A</u>
**Property to Be Searched**

This warrant applies to information which is associated with (1) Facebook account identified by username blake.a.reed.90; and (2) Facebook account identified by username PatriotJuanB and user ID 100033555174309, which are each stored at premises owned, maintained, controlled, or operated by Facebook, Inc., a company that accepts service of legal process at 1601 Willow Road, Menlo Park, California.

## ATTACHMENT B

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

**I.      Information to be disclosed by Facebook, Inc. to facilitate execution of the warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any records that have been deleted but are still available to Facebook or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government corresponding to each account or identifier ("Account") listed in Attachment A:

*1)  For Facebook Account(s):*

a.  For the time period from November 4, 2020, to the present: The contents of any available messages or other communication associated with the Account (including, but not limited to, messages, attachments, draft messages, posts, chats, video calling history, "friend" requests, discussions, recordings, images, or communications of any kind sent to and from the Account, including stored or preserved copies thereof) and related transactional records for all Facebook services used by an Account subscriber/user, including the source and destination addresses and all Internet Protocol ("IP") addresses associated with each message or other communication, the date and time at which each message or other communication was sent, and the size and length of each message or other communication;

b.  For the time period from November 4, 2020, to the present:  All photos and videos uploaded by the Account and all photos or videos uploaded in which the Account has

been "tagged", including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

c.  Basic subscriber records and login history, including all records or other information regarding the identification of the Account, to include full name, physical address, telephone numbers, birthdate, security questions and passwords, and other personal identifying information, records of session times and durations, the date on which the Account was created, the length of service, types of services utilized by the Account, the IP address used to register the Account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, means and source of payment (including any credit or bank account number), and any account(s) linked by machine cookies (meaning all Facebook user identification numbers ("user IDs") that logged into Facebook by the same machine as the Account;

d.  For the time period from November 4, 2020, to the present:  All records or other information related to the Account, including address books, contact and "friend" lists, calendar data, and files; profile information; "News Feed" information; "Wall" postings; Notes; groups and networks of which the Account is a member; future and past event postings; rejected "friend" requests and blocked users; status updates (including relationship status updates); comments; gifts; "pokes"; "tags"; the account's usage of the "like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked"; searches performed by the Account; privacy settings, including privacy settings for individual Facebook posts and

activities; information about the Account's access and use of Facebook applications; and the Account's access and use of Facebook Marketplace;

e.  For the time period from November 4, 2020, to the present:  All "check ins" and other location information;

f.  For the time period from November 4, 2020, to the present:  All records pertaining to communications between Facebook and any person regarding the Account, including contacts with support services and records of actions taken;

g.  All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s), including unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN"), Google Cloud Messaging ("GCM"), Microsoft Push Notification Service ("MPNS"), Windows Push Notification Service ("WNS"), Amazon Device Messaging ("ADM"), Firebase Cloud Messaging ("FCM"), and Baidu Cloud Push);

h.  For the time period from November 4, 2020, to the present: All information held by Facebook related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-Facebook based applications), IP addresses, Global

Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers; and

Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel).

Within **7 days** of the issuance of this warrant, Facebook shall deliver the information set forth above via United States mail, courier, or e-mail to the following:

**Federal Bureau of Investigation Special Agent Daniel J. Senters, djsenters@fbi.gov.**

## II.     Information to be seized by the government

All information described above in Section I that constitutes **fruits, contraband, evidence and instrumentalities** of violations of 18 U.S.C. § 1752(a)(1) and (2), Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority, and 40 U.S.C. § 5104(e)(2)(D) and (G), Violent Entry and Disorderly Conduct on Capitol Grounds, involving **JACK JESSE GRIFFITH** and/or **BLAKE AUSTIN REED** as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e) Information that constitutes evidence concerning **GRIFFITH** and/or **REED** violated 18 U.S.C. § 1752(a)(1) and (2), which makes it a crime to (1) knowingly enter or remain in any restricted building or grounds without lawful authority to do; and (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engage in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions; or attempt or conspire to do so.  For purposes of Section 1752 of Title 18, a "restricted building" includes a posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service, including the Vice President, is or will be temporarily visiting; or any building or grounds so restricted in conjunction with an event designated as a special event of national significance.

(f) Communications, images, videos or information reflecting the planning or execution of entry into the United States Capitol on January 6, 2021.

**III.      Government procedures for warrant execution**

The United States government will conduct a search of the information produced by Facebook and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from Facebook that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH TWO ACCOUNTS STORED AT PREMISES CONTROLLED BY FACEBOOK, INC. PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1752(a)(1)** | **Case No. 21-SC-1548**<br><br>**Filed Under Seal** |

*Reference:*    *USAO Ref. # 2021R00380*

*Subject Account(s):*    (1) Facebook username blake.a.reed.90; and
(2) Facebook username PatriotJuanB and user ID 100033555174309

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Daniel J. Senters, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information which is associated with two Facebook accounts—(1) the account identified by username blake.a.reed.90; and (2) the account identified by username PatriotJuanB and user ID 100033555174309, which is stored at premises controlled by Facebook, Inc. ("PROVIDER"), an electronic communications services provider and/or remote computing services provider which is headquartered at/which accepts service at 1601 Willow Road, Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Facebook to disclose to the government copies of the information (including the content of communications) further described in Section I of

Attachment B.   Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since April 2015. As an FBI Special Agent, I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code—that is, an officer of the United States empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 922. I am currently assigned to a Safe Streets Task Force that investigates criminal enterprises and violent gangs for the Washington Field Office's Northern Virginia Resident Agency. I have training and experience in the areas of gang-related criminal activity, interview and interrogation techniques, evidence recovery, source recruitment, arrest procedures, search and seizure, cellular phone analysis and various other crimes. In my capacity as a Special Agent, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized electronic surveillance; and preparing and executing search warrants. Prior to joining the FBI, I spent ten years as a law enforcement officer with the Virginia State Police, during which time I gained and developed experience investigating criminal matters.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. § 1752(a)(1) and (2), Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority, and 40 U.S.C. § 5104(e)(2)(D) and (G), Violent Entry and Disorderly Conduct on Capitol Grounds, have been committed by **JACK JESSE GRIFFITH** and **BLAKE AUSTIN REED**.  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband or fruits of these crimes further described in Attachment B.

## JURISDICTION

5.     This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC.  *See* 18 U.S.C. § 3237.

## PROBABLE CAUSE

### *Background – The U.S. Capitol on January 6, 2021*

6.     U.S. Capitol Police (USCP), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

7.     At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres.  The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point.  The U.S. Capitol Visitor Center is 580,000

3

square feet and is located underground on the east side of the Capitol.  On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor.  On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway.  All of this area was barricaded and off limits to the public on January 6, 2021.

8.      The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.  Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

9.      On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

10.     On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol.  During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification").  The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST).  Shortly thereafter, by approximately 1:30 p.m. EST, the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

11.     As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.  As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

4

12.     At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

13.     At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby.   Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

14.     Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."   I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

15.     At approximately 2:00 p.m. EST, some people in the crowd forced their way through, up, and over the barricades and law enforcement.   The crowd advanced to the exterior façade of the building.   The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.   At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.   Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

16.     Shortly after 2:00 p.m. EST, individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.   Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.   This information

5

and the below screenshot come from a publicly available video on YouTube "A Reporter's Footage from Inside the Capitol Siege" posted by The New Yorker:



17.     Shortly thereafter, at approximately 2:20 p.m. EST, members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers.  That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down.  USCP ordered a similar lockdown in the House chamber.  As the subjects attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement were forced to draw their weapons to protect the victims sheltering inside.

18.     At approximately 2:30 p.m. EST, known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building.  Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers.  Many of the

federal police officers were injured and several were admitted to the hospital. The subjects also confronted and terrorized members of Congress, Congressional staff, and the media. The subjects carried weapons including tire irons, sledgehammers, bear spray, and tasers. They also took police equipment from overrun police including shields and police batons. These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

19.     Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

20.     At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy Pelosi.

21.     At around 2:47 p.m. EST, subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber. Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress. This information and the below screenshot come from a publicly available video on YouTube "A Reporter's Footage from Inside the Capitol Siege" posted by The New Yorker:



22.    After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?"  Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.   This information and the below screenshot come from a publicly available video on YouTube "A Reporter's Footage from Inside the Capitol Siege" posted by The New Yorker:



23.     One subject left a note on the podium on the floor of the Senate Chamber.  This note, captured by the filming reporter, stated "A Matter of Time Justice is Coming."  This information and the below screenshot come from a publicly available video on YouTube "A Reporter's Footage from Inside the Capitol Siege" posted by The New Yorker:



24.     During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the U.S. Capitol wearing what appears to be, based upon my training and experience, tactical vests and carrying flex cuffs.  Based upon my knowledge, training, and experience, I know that flex cuffs are a manner of restraint that are designed to be carried in situations where a large number of individuals are expected to be taken into custody.





25.    At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m. EST.

26.    At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

27.    At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

28.    Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

29.    Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. EST the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.  The proceedings

resumed at approximately 8:00 pm after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

30.     Beginning around 8:00 p.m. EST, the Senate resumed work on the Certification.

31.     Beginning around 9:00 p.m. EST, the House resumed work on the Certification.

32.     Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3:00 a.m. EST on January 7, 2021.

33.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

34.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021. Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

35.     Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity. It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property. As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

36.     Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot.  In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:



Source: https://losangeles.cbslocal.com/2021/01/06/congresswoman-capitol-building-takeover-an-attempted-coup/.



Source: https://www.businessinsider.com/republicans-objecting-to-electoral-votes-in-congress-live-updates-2021-1.



Source: https://www.businessinsider.com/trump-supporters-leave-threatening-note-in-pelosis-office-2021-1.

### *Facts Specific to This Application*

37.    FBI Agents received a tip that Matthew Bledsoe had been part of the group that entered the Capitol illegally. Upon following up, they received a video compilation that was posted to his Instagram account – theessentialmattbledsoe – which included several selfie photographs of Mr. Bledsoe throughout the day and some videos clips. These images appear to be captured by Mr. Bledsoe on a device he is carrying. Bledsoe is seen both outside and inside the Capitol. In the video of him entering the Capitol, Bledsoe turns the camera to show the door then says, "In the Capitol. This is our house. We pay for this shit. Where's those pieces of shit at?" As he's walking and talking, the video shows him passing through the outer door and into the hallway. Below are several still frames from that video.



38.    The video ends with another video clip captured by a person out of view of the camera where the crowd is chanting, "Stop the steal! Stop the steal!," as they march through the halls of the Capitol. Bledsoe was identified and a Complaint and Arrest warrant were issued for him by Magistrate Judge Zia M. Faruqui in Washington, D.C., on January 13, 2021. He was

arrested in Shelby County, Tennessee on January 15, 2021.  On March 10, 2021, a grand jury indicted Bledsoe, Eric Chase Torrens, Blake Austin Reed, and Jack Jesse Griffith AKA Juan Bibiano in a five-count indictment.  Each of the Defendants is charged with crimes relating to the Capitol on January 6, 2021.

39.     One of the photographs provided by the tipster in the Bledsoe case showed Mr. Bledsoe and a man smiling together in what appears to be the inside of the Capitol building based on the background of the photograph. The man with Mr. Bledsoe in the photograph has lowered a gray respirator with purple and yellow tape bands around the filter cartridges where they meet the main part of the mask. The man also has a distinctive pair of ski goggles with multi-colored glass on his upper forehead.



40.     The tipster also provided a screenshot of the **BLAKE AUSTIN REED** Facebook account (one of the subject accounts—the **blake.a.reed.90 Facebook account**). That account had posted a series of photographs of the events leading up to the breach of the Capitol. Prominently featured in the upper left-hand corner photograph is a man in a distinctive pair of ski goggles with multi-colored glass on the upper portion of his face and a gray respirator with purple and yellow tape bands around the filter cartridges where they meet the main part of the mask on the lower portion of his face. This unusual outfit choice matches the attire of the man smiling alongside Mr. Bledsoe inside the Capitol. The **blake.a.reed.90 Facebook account** screenshot includes the

words, "We The People have spoken and we are pissed! No antifa, no BLM… We The People

took the Capitol!"



    41.    An open records search shows a Blake Reed with a Pinterest account –

blakeareed90 – whose profile picture appears to depict the same person in the photograph with Mr.

Bledsoe.



**Blake Reed**

48 Followers  ·  135 Following



42.     Law enforcement was also able to find open-source LinkedIn profiles for Blake Reed and Mr. Bledsoe showing that they both attended Germantown High School in Memphis, Tennessee from 2000-2002.

43.     Pursuant to legal process, law enforcement also obtained Facebook conversations from Matthew Bledsoe's account.  There are conversations between Facebook Users with the Author Names of "Blake Austin Reed" and "Matt Bledsoe".  Some excerpts of the conversations follow.

44.     Below is a screenshot of a conversation from January 6, 2021:

**Author** Blake Austin Reed (Facebook: 38902904)
   **Sent** 2021-01-06 21:35:20 UTC
   **Body** Hey man send me that picture of us please!!!

**Author** Blake Austin Reed (Facebook: 38902904)
   **Sent** 2021-01-06 22:21:19 UTC
   **Body** That's awesome man!!!!! Thank you!
          You get out ok

**Author** Matt Bledsoe (Facebook: 508548968)
   **Sent** 2021-01-06 22:21:40 UTC
   **Body** Yea knve thwy started sprayin hardcore i bailed

**Author** Blake Austin Reed (Facebook: 38902904)
   **Sent** 2021-01-06 22:22:40 UTC
   **Body** I literally just got back to the hotel. I was in the hallway the girl got
          shot in the neck and they breached a door. When they started
          firing live rounds I bailed out the back right.

45.     On January 6 and 7, 2021 **REED** messaged:

**Author** Blake Austin Reed (Facebook: 38902904)
   **Sent** 2021-01-06 22:35:09 UTC
   **Body** Good times man

**Author** Blake Austin Reed (Facebook: 38902904)
   **Sent** 2021-01-07 13:11:13 UTC
   **Body** Well I'm banned for 7 days. Because I texted 'we are coming for
          you', for the title of a video where we were matching towards the
          Capitol... 🤦🤦

46.     Finally, law enforcement was able to confirm the identification of Mr. **BLAKE AUSTIN REED** by comparing his Tennessee state-issued driver's license photo (on the left) against the photo of Mr. **REED** and Mr. Bledsoe inside the Capitol (on the right).



47.     Based on my review of the Facebook conversation in which Blake Austin Reed says "Hey man send me that picture of us please!!!" and the photo of **REED** and Bledsoe inside the Capitol, I believe the conversation was about the picture in the preceding paragraph.

48.     An informant who is familiar with **JACK JESSE GRIFFITH** identified him as the Facebook user "Juan Bibiano" and provided the FBI with posts from the Facebook account with display name "Juan Bibiano" (one of the subject accounts—the **PatriotJuanB Facebook account**). One post included a photo of "Juan Bibiano" AKA **JACK JESSE GRIFFITH** in what appears to be the Crypt—an area within the Capitol—raising his closed fist into the air. He is wearing clear glasses, a red baseball hat, and a blue jacket which is now unzipped revealing two distinctive light-colored necklaces. Another post also includes a message where "Juan Bibiano" AKA **JACK JESSE GRIFFITH** says, "I even helped stormed [sic] the capitol today, but it only made things worse."



49.   The social media photographs of "Juan Bibiano" were compared to a Tennessee DMV photograph of **JACK JESSE GRIFFITH**, which confirmed that "Juan Bibiano" was **JACK JESSE GRIFFITH**.



50.     On January 12, 2021, Facebook was served with preservation letters under 18 U.S.C. § 2703(f) related to the Facebook accounts belonging to **BLAKE AUSTIN REED** and **JACK JESSE GRIFFITH** as identified in Attachment A. The **blake.a.reed.90 Facebook account** was preserved January 12, 2021 and has an associated Facebook Preservation Case Number 5736026. The **PatriotJuanB Facebook account** was preserved on January 14, 2021 and has an associated Facebook Preservation Case Number 5744067.

## BACKGROUND CONCERNING PROVIDER'S ACCOUNTS

51.     Facebook is the provider of the internet-based accounts (1) Facebook account identified by username blake.a.reed.90; and (2) Facebook account identified by username PatriotJuanB and user ID 100033555174309.

### *Background: Facebook Accounts*

52.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com ("Facebook").  The website is owned and operated by Facebook.  Facebook allows users to establish accounts and users can then use their Facebook accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

53.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user-identification number ("user ID") to each account.  Facebook identifies unique Facebook accounts by a user's e-mail address, the user ID, or the username associated with a Facebook profile.

54.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each Facebook group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "friend" request.  If the recipient of a "friend" request accepts the request, then the two users will become "friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "friends" and a "News Feed," which highlights information about the user's "friends," such as profile changes, upcoming events, and birthdays.

55.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook "friends" to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

56.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or

her "friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

57.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides Facebook users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video. When a user is "tagged" in a photo or video, he or she receives a notification of the "tag" and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a Facebook user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user "tagged" in them.

58.     Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

59.     In general, user-generated content and information about the account (such as a user's photos, "status" updates, an activity log as described below, and the like) that is written using, stored on, sent from, or sent to a Facebook account can be indefinitely stored in connection with that account, unless the subscriber deletes the material. Further, such user-generated content can remain on Facebook's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on Facebook's servers for a certain period of time.

23

60.     A Facebook user also can send other Facebook users a notification indicating that the recipient has been "poked".  Facebook "pokes" enable Facebook users to get the attention of other Facebook users without delivering any user generated messages or other content.

61.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

62.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

63.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

64.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos in which the user has been "tagged", as well as connections made through the account, such as "liking" a Facebook page or adding someone as a "friend".  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

65.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

66.     In addition to the applications described above, Facebook also provides users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

67.     Facebook also retains Internet Protocol ("IP") logs for a given Facebook user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP

address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

68.     Depending on the user's privacy settings, Facebook may also obtain and store the physical location of the user's device(s), including Global Positioning System ("GPS") data, as the user interacts with the Facebook service on those device(s).

69.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

70.     Based on my training and experience, I know that providers such as Facebook also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by Facebook in order to track what devices are using Facebook's accounts and services. Examples of these identifiers include unique application number, hardware model, operating system version,

Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI").  Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other Facebook accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the Facebook account.

71.     Facebook also allows its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices. This application is associated with the subscriber's Facebook account.  In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as Facebook) to locate the device on which the application is installed.  After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider.  Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device).  To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s).  Accordingly, the computers of Facebook are likely to contain useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's Facebook account via the mobile application.

72.      Based on my training and experience, I know that providers such as Facebook use cookies and similar technologies to track users visiting Facebook's webpages and using its products and services.  Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer.  When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before.  This sort of technology can be used to track users across multiple websites and online services belonging to Facebook.  More sophisticated cookie technology can be used to identify users across devices and web browsers.  From training and experience, I know that cookies and similar technology used by providers such as Facebook may constitute evidence of the criminal activity under investigation. By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a Facebook account and determine the scope of criminal activity.

73.      Based on my training and experience, I know that Facebook maintains records that can link different Facebook accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple Facebook accounts.  Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular Facebook account.

74.      Based on my training and experience, I know that subscribers can communicate directly with Facebook about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers such as Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the

27

communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

75.     In summary, based on my training and experience in this context, I believe that the computers of Facebook are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved messages for Facebook subscribers), as well as Facebook-generated information about its subscribers and their use of  Facebook services and other online services.   In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  In fact, even if subscribers provide Facebook with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

76.     As explained above, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the investigating authorities to establish and prove each element of the offense or, alternatively, to exclude the innocent from further suspicion.  From my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and "tagged" photos (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described above, Facebook logs the IP addresses from which Facebook users access

their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its Facebook services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account user.  Last, Facebook account activity may provide relevant insight into the Facebook account user's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).[1]

77.     Based on my training and experience, I know that evidence of who controlled, used, and/or created a Facebook account may be found within the user-generated content created or stored by the Facebook subscriber.  This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group.  In

---

[1] At times, social media providers such as Facebook can and do change the details and functionality of the services they offer.  While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of Facebook's services in connection with submitting this application for a search warrant.  Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation.   This is true for at least two reasons.   First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime.   Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time.   That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced.   Finally, because e-mail accounts and similar Facebook accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

78.   I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorneys **Jamie Carter** and **Mitra Jafary-Hariri**, attorneys for the United States, are each capable of identifying my voice and telephone number for the Court.

## CONCLUSION

79.   Based on my training and experience, and the facts set forth in this affidavit, I submit to the Court that there is probable cause to believe that the following (1) Facebook account identified by username blake.a.reed.90; and (2) Facebook account identified by username PatriotJuanB and user ID 100033555174309 (as described in Attachment A), contain evidence of

violations of 18 U.S.C. § 1752(a)(1) and (2), Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority, and 40 U.S.C. § 5104(e)(2)(D) and (G), Violent Entry and Disorderly Conduct on Capitol Grounds, as described in Attachment B.

80.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

_____
Daniel J. Senters
Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on May 14, 2021.

_____
ROBIN M. MERIWEATHER
U.S. MAGISTRATE JUDGE